UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

STACIE L. LANE,                          )
                                         )
        Plaintiff,                       )
                                         )
        v.                               )  Case No. 1:10-CV-28 JD
                                         )
MICHAEL J. ASTRUE,                       )
*Commissioner of Social*                 )
*Security*,                              )
                                         )
        Defendant.                       )

## OPINION AND ORDER

On January 27, 2010, Plaintiff, Stacie L. Lane ("Lane"), filed her complaint seeking

review of the final decision of the Defendant, Commissioner of Social Security

("Commissioner"). *See* DE 1. On June 16, 2010, this case was reassigned to the undersigned for

all purposes. *See* DE 7. On November 4, 2010, Lane filed her opening brief. *See* DE 27. On

January 13, 2011, the Commissioner filed a response brief. *See* DE 30. On February 10, 2011,

Lane filed a reply brief. *See* DE 33.

## I. Procedural History

On March 15, 2005, Lane filed application for Supplemental Security Income ("SSI")

(Tr. 32, 110-13). On April 29, 2005, Lane also filed an application for Disability Insurance

Benefits ("DIB").[1] (Tr. 32). Lane alleged disability due to diabetes, celiac sprue, asthma,

depression, anxiety, obsessive-compulsive disorder, and diabetic neuropathy. (Tr. 209).

---

[1]The regulations governing the determination of disability for Disability Insurance Benefits are found at 20
C.F.R. §401.1501 *et. seq.*, while the Social Security Income regulations are set forth at 20 C.F.R. §416.901 *et. seq.*
Because the definition of disability and the applicable five-step process of evaluation are identical for both DIB and
SSI in all respects relevant to this case, reference will only be made to the regulations applicable to DIB for clarity.

However, Lane's application was denied initially and upon reconsideration. (Tr. 30-31). Thereafter, Lane requested a hearing; and, on September 24, 2008, Lane appeared with counsel before an Administrative Law Judge ("ALJ"). (Tr. 39-47). Lane's mother and an impartial Vocational Expert ("VE") also attended the hearing. (Tr. 1346-83). Lane appears to have alleged a disability onset date of November 2, 1990, but the ALJ found Lane's alleged onset date to be February 17, 2005. (Tr. 32).

On February 26, 2009, the ALJ issued a decision that Lane was not disabled under the Social Security Act ("Act"), concluding that, although Lane was unable to perform any past relevant work, Lane retained the Residual Functional Capacity ("RFC") to perform other work that existed in significant numbers in the national economy. (Tr. 17-29).

On December 1, 2009, the Appeals Council denied Lane's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4). On January 27, 2010, Lane filed her complaint in this Court, pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner's final decision. *See* DE 1.

## II. Facts

Lane was twenty-seven years old at the time of the hearing. (Tr. 110). Lane has some college education and has past relevant work experience as a fast food cashier and sandwich maker. (Tr. 177, 1352). Following her alleged onset date, Lane worked part-time at Subway and attended courses at Brown Mackie College. (Tr. 32, 38). Nevertheless, Lane has not performed substantial gainful activity since her application date, March 15, 2005. (Tr. 19). Lane was insured for the purposes of the Act's status requirements through September 30, 2010. (Tr. 19).

**A. Physical Impairments**

Lane suffers from numerous physical ailments. The most extensive  impairments Lane has been treated for include: Diabetes, carpal tunnel, knee problems, degenerative disc disease, and migraines.

Lane was diagnosed with Type I Diabetes at age eight, complicated by proliferative diabetic retinopathy, probable albuminuria, and peripheral neuropathy.  (Tr. 1107).  In late 2006, Lane was treated at Elkhart General Hospital for severe hyperglycemia.  (Tr. 516-518).  On February 2, 2007, Lane was seen by  Dr. Helmut Steinberg for a follow-up of her Type I Diabetes Mellitus.  (Tr. 367).  Although Lane had not experienced any significant hypoglycemic episodes since her insulin medication was reduced, her glucose levels remained high.  (Tr. 367). At that time, Dr. Steinberg increased her Humalog prescription.  (Tr. 367).  On March 20, 2008, Dr. Steinberg opined that Lane's diabetes was "approximately stable" but was poorly controlled due to Lane's non-compliance with insulin doses and her failure to count carbohydrates.  (Tr. 352).  On August 21, 2008, Lane received treatment at St. Joseph Regional Medical Center Emergency Room for progressive increase in her blood sugar, nausea, and vomiting.  (Tr. 323). On January 28, 2009, Lane was seen by Dr. Randall Cooper for bilateral foot pain.  (Tr. 236). Dr. Cooper opined that Lane's pain was potentially diabetes-related and stressed regular screening visits to Lane.  (Tr. 236).  On March 19, 2009, Lane underwent a diabetic eye examination at Michiana Eye Center.  (Tr. 1238).  Lane was diagnosed with systemic diabetes without diabetic retinopathy or macular edema in the righteye, and mild nonproliferative retinopathy in the left eye.  (Tr. 1238).  However, no clinically significant macular edema was present.  (Tr. 1238).  Lane was advised to return in a year for a routine eye examination.  (Tr.

1238).

On March 28, 2000, Lane underwent right carpal tunnel release for bilateral carpal tunnel syndrome.  (Tr. 1045).  On May 31, 2007, Lane was seen by Dr. Kevin Drew for a hand EMG which showed "moderate/severe median neuropathy across the left wrist consisting clinically with moderate/severe left carpal tunnel syndrome" and "moderate median neuropathy across the right wrist consisting clinically with a moderate right carpal tunnel with no axonal damage noted."  (Tr. 555).  Dr. Drew recommended bilateral cock-up wrist splints and gave her steroid injections.  (Tr. 555-556).  On June 26, 2007, Lane underwent left index trigger finger release and carpal tunnel release, performed by Dr. Charles Ware.  (Tr. 553).  On August 1, 2008, Lane was seen by Dr. Adelbert Mencias for right hand pain.  (Tr. 250-51).  Upon examination, Dr. Mencias noted that Lane had tenderness in her wrist, moderate first annular swelling of the index finger, positive carpal compression test, and positive Phalen's sign.  (Tr. 250).  Dr. Mencias injected a local anesthetic and released Lane to work with limitations to lift/push/pull no more than five to ten pounds and to not do any heavy gripping.  (Tr. 250-51).  On February 10, 2009, Lane underwent revision right carpal tunnel release for recurrent right carpal tunnel syndrome. (Tr. 1082-1083). On February 20, 2009, ten days later, the numbness and tingling on Lane's right side was better; but the left side remained problematic.  (Tr. 1074).  Dr. Jeffrey Howe, the operating physician, opined that Lane would need a left side revision carpal tunnel release once her right hand healed.  (Tr. 1075).

Lane has also experienced knee problems since 2002.  Prior to Lane's alleged onset date, on September 24, 2003, Lane underwent left knee arthroscopy with partial lateral meniscectomy and partial medial meniscectomy by Dr. Ware.  (Tr. 956).  On November 15, 2007, an MRI

revealed Lane's anterior medial meniscus was subluxed and she had narrowing at her patellofemoral joint. (Tr. 552). On November 16, 2007, Lane was seen in the emergency room for severe knee pain that resulted in the inability to move her knee. (Tr. 552). On November 20, 2007, Lane complained to Dr. Ware of persistent left knee pain. (Tr. 552). Lane was instructed to wear a medial full sole wedge to help redirect the forces on her knee and to return in two months for a re-evaluation. (Tr. 552). On September 18, 2008, Lane was seen by Dr. Frederick Ferlick for left knee pain. (Tr. 247). At that time, Lane rated her pain as a "nine" on a scale of zero to ten and described it as "short/stabbing". (Tr. 247). Examination of Lane's knee revealed tenderness around the knee, swelling over the lateral joint space, and pain with extension and flexion. (Tr. 247). Dr. Ferlick's diagnosed chondromalacia and gave Lane a cortisone injection. (Tr. 247-48). Further, epidural injections, administered by Dr. Charles Ware in late 2008, were unsuccessful at alleviating Lane's pain. (Tr. 1302).

On July 22, 2002, Lane had right ankle arthroscopy with debridement of the ankle joint, especially anterior lateral; and a syndsmosis screw fixation was performed. (Tr. 1022). On January 27, 2003, Lane had the right ankle screws removed. (Tr. 1009).

On January 6, 2007, a lumbar spine x-ray showed minimal multilevel degenerative disc disease changes but otherwise no evidence of spondylosysis; and the lateral projection demonstrated normal vertebral alignment. (Tr. 536).

On December 4, 2006, Lane underwent "right myringotomy and tube and a rigid nasal endoscopy" for chronic otis media and chronic sinusitis, at Memorial Hospital of South Bend. (Tr. 374).

On June 10, 2008, Lane received treatment at St. Joseph Emergency Room for a migraine headache. (Tr. 336). She was given 10 mg of Comparine and 25 mg of Benadryl IV and instructed to follow up with a neurologist. (Tr. 336).

## B. Mental Impairments

In addition to Lane's physical ailments, she has also been diagnosed with a number of mental impairments. Lane began treatment for mental illness at age fifteen, following a suicide attempt. (Tr. 482).

Prior to Lane's alleged onset date, on December 9, 2005, Lane was admitted to Oaklawn Psychiatric Center, following approximately three suicide attempts in two weeks. (Tr. 597-98). At that time, Dr. Ceniceros diagnosed Lane with recurrent, severe major depression, obsessive compulsive disorder, and borderline personality disorder. (Tr. 598). However. Dr. Ceniceros opined that Lane's suicide attempts were "more gestural than anything else". (Tr. 598). Dr. Ceniceros gave Lane a GAF score of 50.[2] (Tr. 598). Dr. Ceniceros found no legal reason to hold Lane; and, on December 16, 2005, Lane was discharged. (Tr. 597).

On February 10, 2006, Lane underwent a Psychiatric Status Examination with Dr. Ceniceros, at the request of the Disability Determination Bureau. (Tr. 587). Dr. Ceniceros again diagnosed Lane with major depressive disorder, recurrent severe; obsessive compulsive disorder;

---

[2] A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. *See* DIAGNOSITC & STATISTICAL MANUAL OF MENTAL DISORDERS-Text Revision 32 (4th ed. 2000). The higher the GAF score, the better the individual's psychological, social, and occupational functioning. A GAF score of 41-50 indicates severe symptoms, such as suicidal ideation, severe obsessional rituals, or frequent shoplifting. A GAF score of 51-60 indicates moderate symptoms, such as flat affect and circumstantial speech, occasional panic attacks, or moderate difficulty in social, occupational, or school functioning. A GAF score of 61-70 indicates some mild symptoms or some difficulty in social occupations, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. A GAF score of 71-80 indicates that if symptoms are present, they are transient and expected reactions to psycho-social stressors, and no more than slight impairment in social, occupational, or school functioning.

and borderline personality disorder. (Tr. 587). Lane's symptoms were noted to include: obsessing, chronic anxiety, suicidal behaviors and thoughts, anhedonia, excessive sleep, irritability, and fatigue. (Tr. 587-592). Dr. Ceniceros opined that Lane's current prognosis was poor and that Lane's current therapy and response was poor. (Tr. 592). Dr. Ceniceros also indicated that Lane had good compliance with treatment but noted that Lane's impairment was chronic. (Tr. 587-592).

On September 6, 2006, Lane began treatment at Madison Center. (Tr. 495-498). On November 2, 2006, Dr. Tina Weldy noted Lane was no better, and perhaps slightly worse, than her last session, losing weight and in engaging in self-injurious behavior. (Tr. 482).

On January 17, 2007, Lane reported an increase in depression and fleeting suicidal thoughts. (Tr. 267). However, Lane indicated she had not been compliant with her medication. (Tr. 267). On March 7, 2007, Lane reported feeling overwhelmed with her college classes and that she withdrew for a semester. (Tr. 264). Lane further indicated that she was continuing to have depressive episodes and anxiety whenever she did not take her medication. (Tr. 264). Despite Lane's representations, Dr. Federspiel opined that Lane had mildly improved since her last visit. (Tr. 264). Lane refused to attend counseling. (Tr. 264).

On June 13, 2008, Lane went in for an unscheduled appointment with Dr. Billie Federspiel. (Tr. 254). Dr. Federspiel observed that Lane's insight, judgment, and concentration were fair; Lane's memory and concentration were intact; and Lane's motor activity was within normal limits. (Tr. 255). Dr. Federspiel noted Lane's longstanding history of impulsivity and Lane's histrionic and high-risk behavior. (Tr. 254). Dr. Federspiel affirmed Lane's prior diagnosis of major depressive disorder, obsessive-compulsive disorder, and borderline

personality disorder.  (Tr. 254-55).  Dr. Federspiel advised Lane to see a psychiatrist at Oaklawn. (Tr. 255).

## C.  Lane's Testimony

On September 24, 2008, Lane testified at a hearing before the ALJ.  (Tr. 1343).  Lane was asked to describe the ways in which her day-to-day life is affected by her impairments.

Lane articulated that she continues to have problems lifting and gripping objects after undergoing two surgeries on her left hand, and one surgery on the right.  (Tr. 1353).  Lane testified that she was currently working as a cashier at Subway but would be fired unless her five-pound restriction was lifted, as her job required her to lift bread pans, ice, trays, and other objects, using both hands.  (Tr. 1352-1355)

Lane further noted that standing, walking, and bending bothered her.  (Tr. 1358).  Walking up and down steps also caused pain.  (Tr. 1358).  Lane stated that neither physical therapy nor a TENS[3] unit has helped her knee pain in the past.  (Tr. 1370).  Lane stated that she owns a car but does not drive because the car is  too small to allow her to extend her leg.  (Tr. 1367).  Lane currently lives with her mother but does not do any housework or contribute to the household.  (Tr. 1367).

Lane testified she had been hospitalized once or twice a month for problems related to diabetes, pain, migraines, and her mental condition.  (Tr. 1368).  She had migraines about two or three times a month, causing her to close her eyes and become nauseous.  (Tr. 1369).  Lane reported that she occasionally had diabetes-related blurry vision.  (Tr. 1371).

Lane stated that she had extreme mood swings, causing her to become suicidal, angry,

---

[3] Lane describes a TENS unit as an electrode machine that stimulates the nerves.  (Tr. 1370).

aggressive, or depressed.  (Tr. 1362).  Lane admitted to having attempted suicide two or three times.  (Tr. 1369).

Lane testified that she was in her third or fourth year in college, where she was studying medical assisting.  (Tr. 1359).  However, Lane opined that she could not pursue a career in the field due to her brittle diabetes.  (Tr. 1359).  Lane attended class four days a week for three hours a day.  (Tr. 1359).  However, Lane stated that she was in danger of being dismissed from the program on account of her frequent health-related absences.  (Tr. 1373).

**D.  Testimony of the Vocational Expert**

Also at the hearing, the ALJ asked a VE to consider a hypothetical individual who had the following limitations: could not perform work that imposed close regimentation of production; could not work in an environment of close and critical supervision; needed flexibility in work structure, such that allows for catching up with ordinary productivity when there had been a "respite"; could not stand or walk longer than seventy-five percent of an eight-hour workday and needs the option to sit or stand while working; could only bend, kneel, and stoop occasionally; could not perform fine work that required constant manipulation, gripping, grasping, twisting, turning, picking, pushing, or pulling with her hands or fingers; could not work in atmospheric concentrations of dust, smoke, or chemical fumes, or in temperature extremes that were less comfortable than in an ordinary commercial retail environment; could not work at unprotected heights, around dangerous machinery, or around vehicles moving in close quarters; and was limited to lifting five pounds frequently, and ten pounds occasionally. (Tr. 1376-77).

The VE testified that such an individual would not be able to perform Lane's past work

as a cashier or sandwich maker.  (Tr. 1378).  However, the VE noted that the same individual

could perform the sedentary, unskilled jobs of document preparation clerk, food and beverage

order clerk, charge account clerk, and surveillance monitor.  (Tr. 1378-80).  Additionally, the VE

testified that the hypothetical individual could perform the light, unskilled jobs of information

clerk and parking lot attendant.  (Tr. 1379).

**E.  ALJ's Opinion**

In his opinion, the ALJ noted that Lane met the insured status requirements of the Act

through September 30, 2010 ("date last insured").  (Tr. 19).  In addition, the ALJ found that Lane

had not engaged in substantial gainful activity ("SGA") since March 15, 2005, the application

date.  (Tr. 19).  The ALJ concluded that Lane had severe impairments but that her impairments

did not, singly or in combination, meet or medically equal one of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 19).  Instead, the ALJ found that Lane had the RFC

to stand and walk for no more than seventy-five percent of an eight-hour workday.  (Tr. 24).  The

ALJ further determined that Lane was not limited in her ability to sit, but Lane needed to be able

to alternate between sitting and standing.  (Tr. 24).  In addition, the ALJ found that Lane could

not reach extreme postures more than occasionally and concluded that Lane could not perform

work that required constant manipulation, including fine work, gripping, grasping, twisting,

turning, picking, pushing, or pulling with her hands or fingers.  (Tr. 24).  The ALJ also

concluded that Lane was limited to lifting ten pounds occasionally and five pounds frequently.

(Tr. 24).  Finally, the ALJ concluded that Lane could not perform work that imposed close

regimentation of production or close and critical supervision.  (Tr. 24).

The ALJ concluded that, based on this RFC and the VE's testimony, Lane could not

perform her past work. (Tr. 27). Nevertheless, the ALJ further concluded that Lane could still perform a significant number of jobs in the national economy and that Lane was, therefore, not disabled. (Tr. 27-29).

### III. Standard of Review

The ALJ's ruling becomes the final decision of the Commissioner when the Appeals Council denies review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). Thereafter, in its review, the District Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if reasonable minds could differ about the disability status of the claimant, the Court must affirm the Commissioner's decision if it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a critical review of the evidence before affirming the Commissioner's decision; and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Id*. Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475

(7th Cir. 2009).

Further, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the ALJ's factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## IV. Analysis

Disability and Supplemental Insurance Benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel,* 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations establish a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(I)-(v). The steps are used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform past relevant work; and
5. Whether the claimant can perform other work in the community.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulation, disability is acknowledged by the Commissioner. *See* 20 C.F.R.. § 404.1520(a)(4)(iii). However, if a listing is found not to be met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC; which, in turn, is used to

12

determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner at step five to show that a significant number of jobs, which the claimant is still capable of performing, exist in the national economy. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Lane primarily alleges that the ALJ committed four errors. First, Lane argues that the ALJ erred at step three, in failing to properly articulate the reason Lane's impairments did not meet a listed impairment. Second, Lane asserts that the ALJ erred in determining her RFC by failing to incorporate all of her impairments. In this regard, Lane also argues that the ALJ's credibility determination is not supported by substantial evidence. Last, Lane claims that the ALJ erred at step five, asserting that the ALJ failed to resolve an apparent discrepancy between the Dictionary of Occupational Titles ("DOT") and the VE's testimony.

## A. The ALJ's finding that Lane's impairments did not meet or equal a Listed Impairment was insufficiently articulated.

First, Lane argues that the ALJ erred at step three of the evaluation by failing to evaluate whether Lane's physical and mental impairments met or equal a listed impairment. In particular, Lane asserts that the ALJ failed to evaluate whether she met or equaled Listings: §1.02 Major Dysfunction of a Joint; §1.04 Disorders of the Spine; §9.08 Diabetes Mellitus; §12.08 Personality Disorders; and §12.02 Affective disorders. The Court considers Lane's argument to be persuasive as to several of the aforementioned Listings.[4]

---

[4] Lane asserts that the ALJ should have considered whether Lane's impairments met or equaled Listing 1.04: Disorders of the Spine. However, besides a single citation to a 2007 x-ray showing "unremarkable" and "minimal multilevel degenerative disc disease changes", *see* Tr. at 536, Lane does not point to any evidence in the

Under a theory of presumptive disability, a claimant is eligible for benefits if she has an impairment that meets or equals an impairment in the Listing of Impairments, found in 20 C.F.R. Pt. 404, Subpt. P, Appendix 1. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); 20 C.F.R. § 404.1520(d). Accordingly, at Step 3, the ALJ must determine whether the claimant meets or equals any of the listed impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The Listing of Impairments ("the Listings") describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity. *Barnett*, 381 F.3d at 668; 20 C.F.R. §§ 404.1525(a), 416.925(a). For each listed impairment, there are objective medical findings and other findings that must be met to satisfy the criteria of that Listing. 20 C.F.R. §§ 404.1525(c)(2)-(3), 416.925(c)(2)-(3). Thus, when a claimant satisfies the criteria to meet a listed impairment, that person is deemed disabled and is automatically entitled to benefits, regardless of his or her age, education, or work experience. *Barnett*, 381 F.3d at 668; 20 C.F.R. §§ 404.1525(a), 416.925(a); 404.1525(c)(3), 416.925(c)(3). Alternatively, a claimant may also demonstrate presumptive disability by showing that his impairment is accompanied by symptoms that are equivalent in severity to those described in a specific Listing. *Barnett*, 381 F.3d at 668; 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5); 404.1526; 416.926.

Lane contends that remand is warranted because the ALJ failed to provide any evaluation of several Listings which she says correspond with her identified impairments of: affective disorder, knee and ankle pain, personality disorder, and diabetes mellitus. Given the ALJ's complete lack of articulation in relation to a number of Lane's identified impairments, the Court

record which would reasonably support that she had an impairment of sufficient severity that would trigger an evaluation of this Listing. Consequently, the Court will not entertain this argument any further.

14

agrees.[5]

The Court disagrees that the ALJ failed to fairly and fully evaluate whether Lane's affective disorder met or equaled a Listing. [6]  A review of the ALJ's decision reveals that the ALJ did a complete and thorough review of Listing 12.04.  *See* Tr. at 20-21.  In particular, the ALJ first identified the relevant criteria of the Listing and then proceeded to evaluate whether the "B" criteria were met, spending nearly a full page assessing Lane's functioning under the relevant criteria.  *Id.*  The Court considers this analysis to be well-developed and adequately supported by evidence in the record.  *See Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 1997) (noting that an ALJ "must articulate, at least minimally, his analysis of the evidence so that this court can follow his reasoning.").  Consequently, the Court does not conclude that the ALJ failed to adequately assess whether Lane's impairments met or equaled Listing 12.04.  Unfortunately, the ALJ's thorough discussion of the Listings ends there.

Lane additionally asserts that the ALJ should have discussed whether her knee or ankle disorders met or equaled the criteria of Listing §1.02 Major Dysfunction of a Joint, whether her

---

[5]To begin, however, the Court notes that review of the ALJ's step three determination is made unnecessarily difficult on account of the ALJ's minimally articulated conclusion at step two.  Specifically, while the ALJ found that Lane suffered from severe impairments, he did not specify what those impairments were.  *See* Tr. at 19.  Given the exceedingly large record in this case, the ALJ's failure to specifically identify which impairments he found to be severe makes it difficult to evaluate which impairments warranted discussion at step three of the analysis.  Nevertheless, the ALJ does identify a number of "medical conditions" as part of his RFC discussion, and this Court will consider these "conditions" as a starting point.  *See* Tr. at 24 (citing knee problems, carpal tunnel syndrome, celiac sprue, asthma, diabetes mellitus, affective disorder, and borderline personality disorder).  Of these identified medical conditions, Lane asserts that the ALJ failed to evaluate whether her knee problems, diabetes, personality disorder, and affective disorder met or equaled a listed impairment.

[6]In her opening brief, Lane mistakenly cites to Listing 12.02, as the proper Listing for Affective Disorders.  However, Listing 12.02 refers to "Organic Mental Disorders", requiring a showing of a "[h]istory and physical examination or laboratory tests demonstrat[ing] the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities."  20 C.F.R. Pt. 404, Subpt. P, Appendix 1.  Lane has pointed to no such evidence in the record.  Instead, the record is replete with references to Lane's treatment for bipolar disorder.  As such, it appears that Lane should have cited Listing 12.04, the Listing which addresses Affective Disorders such as Lane's bipolar diagnosis.

15

diagnosed personality disorder met or equaled Listing §12.08 Personality Disorders, and whether her diabetes diagnosis met or equaled Listing §9.08 Diabetes Mellitus. In relation to Lane's knee and ankle disorders, the ALJ cited a related listed impairment, Listing 1.03 Reconstructive Surgery or Surgical Arthrodesis of a Major Weight-Bearing Joint. *See* Tr. at 20. However, the ALJ did nothing more than quote the applicable criteria of the Listing and provided absolutely no analysis of the Listing. *Id. Compare* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (Listing 12.03). In regards to Lane's diabetes, the ALJ cited the appropriate listed impairment, Listing 9.08 Diabetes Mellitus[7], but the ALJ similarly failed to provide any analysis of this Listing. *See* Tr. at 19. Finally, with respect to Lane's personality disorder, the ALJ did not cite or discuss the relevant listed impairment, Listing 12.08, at all.[8]

The Commissioner does not attempt to defend the ALJ's seemingly-incomplete analysis.

_____

[7] The Court notes that, while Lane's appeal has been pending in this Court, the Social Security Administration adopted new regulations which eliminated Diabetes Mellitus as a listed impairment. *See* Revised Medical Criteria for Evaluating Endocrine Disorders, 76 Fed. Reg. 19692-01 (effective June 7, 2011) (codified at 20 C.F.R. Pt. 404, Subpt. P and 20 C.F.R. Pt. 416, Subpart I).

As a result, there is now only a single, diabetes-related listed impairment, which is only applicable to children from birth to age six. *See* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (Listing 109.08). *See also* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1109.00(B)). Further, the ALJ's step three evaluation regarding Diabetes Mellitus, as with other endocrine disorders, now involves a determination as to whether the claimant's Diabetes Mellitus meets or medically equals the criteria of a listed impairment involving another body system. *See* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (Listing 9.00(B); Listing 109.00(B)). If the ALJ determines that the claimant's diabetes does not meet or medically equal another listed impairment, the claimant's diabetes is then considered as part of the ALJ's RFC determination and pursuant to steps four and five of the sequential analysis. 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (Listing 9.00(C)).

For purposes of this Court's review, however, the Court applies the rules that were in effect at the time the ALJ issued his decision. *See* 76 Fed. Reg. 19692-01 n.3 ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions."). However, on remand, the ALJ will apply the new rule in his consideration of Lane's diabetes at step three of the sequential analysis. *See* 76 Fed. Reg. 19692-01 n.3 ("If a court reverses our final decision and remands the case for further administrative proceedings after the effective date of these final rules, we apply these final rules to the entire period at issue in the decision we make after the court's remand.").

[8] In this regard, the Court further notes that the ALJ failed to discuss Lane's personality disorder at any part of his opinion. While it may have been that the ALJ did not consider Lane's personality disorder to be severe, the ALJ did not so indicate in his decision. Consequently, the Court can not determine whether the ALJ considered the limiting effects of Lane's personality disorder at all. As a consequence, on remand the ALJ must evaluate and discuss the relative weight that he assigns to Lane's personality disorder at each point of the sequential analysis.

Instead, the Commissioner responds that the ALJ did not have a duty to discuss the Listings because Lane failed to demonstrate that her impairments satisfy the relevant criteria. It is well-established that a claimant has the primary burden of showing that her impairments satisfy all of the various criteria specified in the Listings. *Knox v. Astrue*, 327 Fed.Appx. 652, 655 (7th Cir. 2009) (unpublished opinion) ("Although an ALJ should provide a step-three analysis, a claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a Listing"); *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999); *Garcia v. Astrue*, 2008 WL 1771856 at **6-7 (N.D.Ind. 2008). However, it is equally well-established that the ALJ has a duty to "mention the specific [L]istings he is considering" and "offer more than a perfunctory analysis of the Listing." *Ribaudo*, 458 F.3d at 583 (internal quotations removed); *Barnett*, 381 F.3d at 668; *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2002); *Steele v. Barnhart*, 290 F.3d 936, 940-41 (7th Cir. 2002).

The Court notes that in her briefing before this Court, Lane offers no explanation how the record evidence, or a medical opinion evaluating the record evidence, supports Lane's conclusion that she meets or medically equals one of the aforementioned listings. Instead, Lane merely cites the relevant (and a few not relevant) Listings and argues that the ALJ failed to provide an analysis of the same.[9] Further, there is no evidence that Lane's counsel provided such an evidentiary explanation at the hearing before the ALJ. *See generally* Tr. at 1346-83. Nevertheless, the record is replete with evidence regarding the severity and limiting effects of these three conditions. *See e.g.* Diabetes (Tr. at 236, 323, 352, 367, 516-518, 1238, 1359, 1368,

---

[9] In addition, Lane's initial memorandum to the ALJ also refers to the impairments in question but similarly provides no evidentiary explanation to suggest how the Listings are met or medically equaled. (Tr. 37).

1371); Ankle and Knee Disorders (Tr. at 247-48, 552, 956-57, 1009, 1022-23, 1302, 1358, 1367, 1370); Personality Disorder (Tr. at 254-55, 587-598, 1362, 1368-69).  Further, particularly troubling to the Court, the ALJ cites to a few of the relevant Listings and then provides absolutely no analysis regarding the same.  *See* Tr. at 19-20.

The Court considers remand to be appropriate, at least with respect to Lane's knee and ankle disorders and with respect to Lane's diabetes.  Throughout the review of the ALJ's decision, this Court is primarily focused on whether the ALJ adequately articulated his analysis and sufficiently supported his conclusions with record evidence.  *Terry*, 580 F.3d at 475; *Craft*, 539 F.3d at 673.  In the immediate case, the ALJ acknowledged a few of the relevant Listings, indicating that the ALJ considered those particular Listings to warrant evaluation in Lane's case.  In addition, the ALJ proceeded to make a determination that Lane impairments, individually or in combination, did not meet or medically equal a Listing.  *See* Tr. at 19.  However, in so doing, the ALJ made no effort to "create a logical bridge" between the facts and his conclusions.  *See Terry*, 580 F.3d at 475; *Dixon*, 270 F.3d at 1176.  Without such a bridge, this Court can not trace the ALJ's reasoning and can not evaluate whether the ALJ adequately considered the applicable medical evidence in rendering his conclusion.  *See Brindisi*, 315 F.3d at 786 (remanding an ALJ's Listing evaluation because it was "devoid of any analysis that would enable meaningful judicial review"); *Scott*, 297 F.3d at 595-96 (holding the same and noting that the ALJ's failure to discuss evidence in light of the Listing's analytical framework left the court "with grave reservations as to whether his factual assessment addressed adequately the criteria of the listing"); *Steele*, 290 F.3d at 940-41.  Consequently, remand is necessary in order for the ALJ to fill in the analytical gaps at step three, at least with respect to Lane's knee and ankle disorders

and Lane's diabetes.[10]

Further, the Court notes that the ALJ did not appear to consult a medical expert regarding whether a Listing was met or equaled. The Seventh Circuit has made clear that an ALJ must consider an expert's opinion when determining whether a claimant's impairment equals a Listing. *Barnett*, 381 F.3d at 670-71. *See also* 20 C.F.R. § 404.1526(c) (when considering equivalency with a Listing, the Commissioner "also consider[s] the opinion given by one or more medical or psychological consultants designated by the Commissioner"); S.S.R. 96-6p ("longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence . . . must be received into the record as expert opinion evidence and given appropriate weight.").

In this regard, the Commissioner argues that the ALJ properly relied upon the opinions of two state agency physicians when determining medical equivalency. *See* DE 30 at 9-10. However, the transcript citations provided by the Commissioner do not appear to contain any opinions in relation to the issue of medical equivalency to a Listing. *See* Tr. at 30-31. Further, even assuming that the record pages reference another document not specifically cited by the Commissioner wherein the state agency physicians did opine as the Commissioner alleges, there is absolutely no evidence, within the ALJ's opinion, to suggest that the ALJ actually relied on the opinions when making his step three determination. As such, because the ALJ did not explain any such reliance on the medical opinions of the state agency physicians at step three of

---

[10] Whether Lane's personality disorder warrants an evaluation at step three depends, in part, on whether the ALJ considers the impairment to be severe. This Court is additionally remanding this case so that the ALJ can evaluate the limiting effects of Lane's personality disorder at all parts of the sequential analysis. *See supra* note 8. Based upon the ALJ's re-evaluation of Lane's personality disorder at step two of his analysis, the ALJ will, then, need to determine whether discussion of the relevant listed impairment, Listing 12.08, is also warranted in Lane's case.

his analysis, the Commissioner's arguments are improper *post hoc* rationalizations which can not be considered by the Court. *See Steele*, 290 F.3d at 941 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)); *Hendricks v. Astrue*, 2009 WL 648610 at *8 (S.D. Ind. 2009); *Menedez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). Instead, "principles of administrative law require the ALJ to rationally articulate the grounds for her decision;" and the Court, therefore, "confines its review to the reasons supplied by the ALJ." *Steele*, 290 F.3d at 941; *Hendricks*, 2009 WL 648610 at *8. *See also Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).

Consequently, because there is no evidence that the ALJ consulted or relied on the testimony of a medical expert at step three of his analysis, the Court additionally concludes that, on remand and when considering whether Lane's impairments meet or equal a listed impairment, the ALJ must consult the opinion of a medical expert as required by the Social Security regulations and the law of this Circuit.

**B. The ALJ's finding regarding Lane's Residual Functional Capacity is adequately articulated but not sufficiently supported.**

Next, Lane contends that the ALJ erred in determining her RFC by failing to accurately evaluate the severity of her physical and mental impairments.[11] In response, the Commissioner

_____

[11]In addition Lane argues that the ALJ placed a disproportionate amount of weight on her part-time job at Subway and her enrollment at Brown Mackie College when assessing her RFC. In her opening brief, Lane does not explain the purported relevance of this argument. *See* DE at 15-16. However, in her reply, Lane quotes a section of the ALJ's credibility determination, indicating that Lane may have been asserting a credibility determination. *See* DE 33 at 1-2. Perhaps confused by Lane's somewhat cryptic argument, the Commissioner did not directly respond to Lane's argument in its response. However, the Court does not consider the Commissioner's silence to warrant assent to Lane's contentions. Rather, the Court is more inclined to treat Lane's thinly-explained argument as being raised for the first time in her reply brief and, therefore, deemed waived. *Goodwin v. Gary Ry. Co.*, 2011 WL 2357863 at *4 (N.D.Ind. 2011); *Herron v. Comm'r of Soc. Sec.*, 2011 WL 839665 at *9 (N.D.Ind. 2011). Nevertheless, because the issue is easily decided in Lane's case, the Court will briefly address it here.

The Court considers the ALJ's credibility determination to be both sufficiently articulated and substantially supported by the record evidence. Indeed, the Court commends the ALJ's thorough evaluation of Lane's credibility, offering no less than five reasons for his decision, each supported by substantial evidence in the record.

Because the ALJ is in the best position to observe witnesses, an ALJ's credibility determination will not be upset on appeal so long as it finds some support in the record and is not patently wrong. *Herron v. Shalala*, 19 F.3d

maintains that Lane failed to identify what additional limitations she thinks should have been assessed by the ALJ. Instead, the Commissioner contends the ALJ's RFC determination accommodated all of Lane's relevant limitations and was supported by the record evidence. The Court notes that the ALJ failed to discuss the record evidence relating to Lane's personality disorder and Lane's ankle disorder. Consequently, while the ALJ's RFC decision is sufficiently articulated as to the limitations actually considered, the Court concludes that remand is, nevertheless, necessary so that the ALJ can evaluate the limiting effects of these outstanding impairments.

The ALJ must determine the claimant's residual functional capacity before performing steps four or five. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8p. Residual functional capacity is an assessment of the work-related activities a claimant is able to perform on a regular and continued basis despite the limitations imposed by an impairment or combination of impairments. *Id.* This finding must be

---

329, 335 (7th Cir. 1995). Indeed, "[o]nly if the trier of facts grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). However, as a bottom line, SSR 96-7p requires an ALJ to consider the entire case record and articulate specific reasons to support her credibility finding. *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003). Further, while an ALJ is not required to provide a complete written evaluation of every piece of testimony and evidence, an ALJ cannot simply state that an individual's allegations have been considered or that the individual's allegations are not credible. *Id.*; SSR 96-7p.

In the immediate case, the ALJ devoted a full page of discussion to his credibility determination. *See* Tr. at 23-24. Therein, the ALJ held that Lane was not credible because: (1) "[Lane's] job duties at the jobs she has held since the alleged onset date have generally exceeded her alleged capacity"; (2) Lane's participation in advanced educational programs "[f]urther undermin[e] the allegations of disabling limitations, especially of her alleged inability to pay attention and to sustain concentration due to her mental and physical impairments"; (3) Lane's "contempt for governing legal rules" which suggest dishonesty; (4) Lane's history of medical non-compliance, particularly in relation to Lane's diabetes; and (5) the lack of medical evidence to support the limiting effects alleged by Lane and her mother. *See* Tr. at 23-24. Each of these independent reasons supporting the ALJ's credibility determination is buttressed with a number of examples from the record evidence. While Lane may not agree with the ALJ's evaluation, the Court affords the ALJ's decision great deference, especially, as here, where the ALJ provides several reasons for his decision and supports each with substantial evidence from the record. *Skarbek v. Barnhart,* 390 F.3d 500, 505 (7th Cir. 2004) (noting that a reviewing court will affirm a credibility determination "as long as the ALJ gives specific reasons that are supported by the record"); *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1995).

assessed based on all the relevant evidence in the record, 20 C.F.R. § 404.1545(a)(1), must

consider all medically determinable impairments even if not considered "severe," 20 C.F.R. §

404.1545(a)(2), and must be supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863,

873 (7th Cir. 2000).

The ALJ has final responsibility for deciding a claimant's residual functional capacity,

which is a legal decision rather than a medical one. *See* 20 C.F.R. §§ 404.1546(c), 404.1527(e).

A reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh the

evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes v.

Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005). Consequently, an ALJ's decision cannot stand if it

lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539.

Further, an ALJ must evaluate both the evidence favoring the claimant as well as the evidence

favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his

findings. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Zurawski v. Halter*, 245

F.3d 881, 888 (7th Cir. 2001). Nevertheless, an ALJ need not provide a written evaluation of

every piece of testimony and evidence. *Haynes*, 416 F.3d at 626; *Golembiewski*, 322 F.3d at

917; *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). Instead, an ALJ need only minimally

articulate his justification for accepting or rejecting specific evidence of disability. *Rice v.

Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir.

2008).

Lane claims that the ALJ's RFC determination does not reflect the limiting effects of all

of her impairments. Specifically, Lane contends that the ALJ failed to assess her: knee and ankle

disorders, diabetes, carpal tunnel syndrome, and mental impairments. However, a review of the

ALJ's decision reveals that this is not the case. For instance, the ALJ assessed the history of Lane's carpal tunnel disorder on page nine of the ALJ's opinion. *See* Tr. at 25. On the same page, the ALJ spent considerable time assessing the history of Lane's knee disorder. *Id*. Lane's diabetes is discussed by the ALJ on the following pages. *See* Tr. at 26. Further, the ALJ generally discussed Lane's mental disorders on page eleven of his opinion. *See* Tr. at 27. From this discussion, the ALJ prepared a detailed RFC determination that included significant exertional and non-exertional limitations. *See* Tr. at 24. Specifically, the ALJ included the exertional restrictions that Lane could not stand or walk longer than seventy-five percent of an eight-hour workday, needed the option to sit or stand while working, and could only bend, kneel, and stoop occasionally. *See* Tr. at 24. Each of these restrictions are supported by the record evidence and seem to accommodate Lane's knee disorder. In addition, the ALJ also included the exertional restrictions that Lane could not perform fine work that required constant manipulation, gripping, grasping, twisting, turning, picking, pushing, or pulling with her hands or fingers and the restriction that Lane was limited to lifting five pounds frequently and ten pounds occasionally. *See* Tr. at 24. These too are supported by the record evidence and appear to accommodate Lane's carpal tunnel syndrome. In regards to the ALJ's non-exertional restrictions, the ALJ included the restrictions that Lane could not perform work that imposed close regimentation of production and could not work in an environment of close and critical supervision; and the ALJ included the additional restriction that Lane needed flexibility in work structure, allowing Lane to catch up with ordinary productivity after a "respite" in work activity. *See* Tr. at 24. These limitations are also supported by record evidence and seem to accommodate the limiting effects relating to most of Lane's mental disorders.

Nevertheless, the Court is persuaded that the ALJ failed to discuss, even minimally, what limiting effects he ascribed to Lane's ankle disorder and personality disorder. Both impairments are well-documented in the medical record but neither receives any discussion in the ALJ's RFC discussion. Consequently, although the ALJ may have minimally met his articulation burden with respect to the RFC determination and the impairments actually discussed in relation thereto, remand is appropriate so that the ALJ can also discuss the limiting effects of these additional impairments. *See Lopez*, 336 F.3d at 539 (noting that an ALJ's decision "can not stand if it lacks evidentiary support or an adequate discussion of the issues"); *Zurawski*, 245 F.3d at 888 (noting that an ALJ "must articulate at some minimal level her analysis of the evidence to permit an informed review").

## D. The ALJ's conclusion that Lane was capable of performing other work in the national economy was not sufficiently supported.

Finally, Lane contends that the ALJ erred in his step five decision. The analysis at step five focuses on whether the claimant can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v) and (g), 416.920(a)(4)(v) and (g). At step five, the ALJ considers numerous factors, such as: the claimant's residual functional capacity ("RFC"), age, education, and work experience, to see if the claimant can make an adjustment to other work. *Id*. If a claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. *Id*. However, if the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled. *Id*.

At this step, the ALJ often utilizes the testimony of a vocational expert, proffering hypothetical questions consistent with the ALJ's RFC findings. To the extent the ALJ relies on the testimony from a vocational expert, the hypothetical question posed to the expert must

incorporate all relevant limitations from which the claimant suffers in order to accurately gauge how many jobs are available to the claimant in the national economy. *Young*, 362 F.3d at 1003. When a vocational expert provides testimony about the requirements of a specific occupation, the ALJ has an affirmative duty to ask whether the testimony conflicts with the DOT. *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008); *Hofer v. Astrue*, 588 F.Supp.2d 952, 965-66 (W.D.Wis. 2008). Further, when there is an apparent conflict between the vocational expert's testimony and the information provided in the DOT, the ALJ has an affirmative responsibility to obtain a reasonable explanation for the apparent conflict. *Overman*, 546 F.3d at 462-63; *Hofer*, 588 F.Supp.2d at 966; SSR 00-4p. However, where claimant's counsel did not identify a conflict at the hearing, the claimant must show that the conflict was obvious enough that the ALJ should have picked up on it without any assistance. *Overman*, 546 F.3d at 462-63; *Hofer*, 588 F.Supp.2d at 966-67; *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004).

Lane first argues that the hypothetical posed to the VE did not incorporate all of Lane's restrictions. At first glance, the Court notes that the ALJ's hypothetical was a mirror image of his RFC finding. *Compare* Tr. at 24 and Tr. at 1376-77. As a result, the Court initially opines that the hypothetical is a fair reflection of the opinions of the ALJ. *See Packham v. Astrue*, 2011 WL 13531 at *10 (N.D.Ill. 2011) (holding valid a hypothetical based upon a valid RFC determination). *See also Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002) (noting that an ALJ may properly rely upon a VE's testimony, so long as the ALJ submits a hypothetical that reflects the ALJ's conclusions regarding the extent of the claimant's impairments); *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) (noting that an ALJ is "required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible").

However, as indicated in this Court's review of the ALJ's RFC decision, this Court is not clear whether the ALJ evaluated the limiting effects of Lane's ankle disorder and Lane's personality disorder when formulating his RFC decision. As a result, the Court can not be certain whether the ALJ's hypothetical included the resulting limitations of these impairments. Hypothetical questions posed to vocational experts must include all limitations supported by medical evidence in the record. *Young*, 362 F.3d at 1003; *Steele*, 290 F.3d at 942. Because this Court cannot verify whether the ALJ's hypothetical meets this standard without greater articulation by the ALJ, the Court considers remand on this issue to be appropriate as well. On remand, the ALJ will need to assess whether a new hypothetical is warranted after the ALJ first determines what additional limitations, if any, may be warranted to account for these additional impairments.

Next, Lane contends that the ALJ erred by relying on, what Lane describes as, "the outdated" DOT. In particular, Lane argues that the DOT should be replaced by a developing electronic database. This argument is without merit and can, therefore, be addressed in short order. The law is abundantly clear that, in making a step five determination, the ALJ is permitted to take administrative notice of the DOT and rely upon information contained therein. *Hofer*, 588 F.Supp.2d at 965-66; 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1). As such, the ALJ did not err in relying on the same.

Third, Lane argues that the jobs cited by the vocational expert do not exist in sufficient numbers in the national economy. In Lane's case the vocational expert testified, which the ALJ later adopted, that despite Lane's limitations, Lane could still perform five jobs with a combined number of 1,025-1,225 positions in the regional economy. *See* Tr. at 28, 1379-80. Specifically,

the vocational expert testified that there existed: 200-300 call-out operator positions, 200-300 document preparer positions, 200 order clerk positions, 100 charge account clerk positions, 100 surveillance monitor positions, 100 information clerk positions, and 125 parking lot attendant positions in the regional economy. *See* Tr. at 28, 1379-80. Despite Lane's assertions, the Seventh Circuit noted that as few as 174 positions has been considered sufficiently significant and that 1,000 positions has been repeatedly found to be significant. *See Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) (citing several cases wherein the number of positions, ranging from 174 to 1,400, were considered significant). The number of positions cited by the vocational expert and the ALJ in Lane's case are well within this range. Therefore, Lane's argument regarding the number of jobs in the regional economy is unpersuasive.

Finally, Lane contends that the ALJ failed to obtain a reasonable explanation from the vocational expert regarding an apparent conflict between the vocational expert's testimony and the DOT. Lane's argument in this regard is not well developed and is, therefore, difficult to discern; and it appears that Lane may be arguing either one of two things.

On the one hand, Lane appears to argue that the limiting effects of her carpal tunnel syndrome prevent her from performing light work and her knee and ankle problems prevent her from performing sedentary work as they are defined by the applicable Social Security Report and regulations. *See* SSR 83-10. The Court notes, however, that the ALJ did not specifically limit Lane to either light or sedentary work in either his RFC or his hypothetical to the ALJ. Rather, the ALJ proffered a detailed RFC with uniquely-crafted limitations to accommodate the limiting effects of Lane's impairments, including those limitations stemming from Lane's carpal tunnel syndrome and knee disorder. The Court has already determined that the ALJ's RFC analysis, at

least as to the limiting effects of Lane's carpal tunnel syndrome and knee disorder, was

adequately supported and sufficiently articulated. Further, the Court considered the hypothetical

to be a fair reflection of the ALJ's RFC determination.[12] Consequently, to the extent that Lane is

attempting to assert additional limitations related to her carpal tunnel syndrome and knee

disorder which were not asserted in either the ALJ's RFC or his resulting hypothetical, the Court

is not persuaded by this argument. However, as previously discussed, on remand, the ALJ will

need to address whether additional limitations are necessary in relation to Lane's ankle

problems. On the other hand, Lane appears to argue that the jobs identified by the vocational

expert do not comport with the limitations included in the ALJ's hypothetical. Piecing together

Lane's argument, Lane seems to be pointing out that the vocational expert characterized the jobs

he identified as sedentary and light. *See* Tr. at 1379-81. However, Lane notes that the

applicable Social Security Report explains that most unskilled sedentary jobs require "good use

of the hand and fingers for repetitive hand-finger actions." *See* SSR 83-10. Similarly, although

not explained by Lane, the same Social Security Report indicates that light work involves lifting

no more than twenty pounds at a time and frequently lifting ten pounds. *See* SSR 83-10. The

corresponding portions of the ALJ's hypothetical, however, prevented Lane from "engag[ing] in

work demanding constant manipulation involving fine work, gripping, grasping, twisting and

turning, picking and pushing or pulling with the ands [sic] and fingers" and limited Lane to

"lift[ing] and carry[ing] as much as ten pounds occasionally and as much as five pounds

frequently. *See* Tr. at 1377. Though not so clearly articulated by Lane, Lane seems to assert that

---

[12] Although the Court has determined that remand is appropriate regarding both the ALJ's RFC and the ALJ's hypothetical, remand in this case serves the narrow purpose of addressing articulation errors regarding the ALJ's assessment of Lane's ankle and personality disorder. The Court did not, however, find any error with the ALJ's assessment of Lane's carpal tunnel syndrome.

this discrepancy amounted to an apparent conflict that required clarification by the ALJ.

The Court notes that the ALJ did seek clarification with the vocation expert whether the vocational experts testimony was consistent with the ALJ's hypothetical and the DOT.

> Q. All right. Is your account of these jobs as you characterized them accommodating the limitations I set forth consistent with their depiction in the Dictionary of Occupational Titles?
> A. Yes, I believe, the general description generically in there would be consistent with my account.

*See* Tr. at 1381. Further, the ALJ went on to ensure that his additional limitation to a sit/stand option also comported with the vocational expert's interpretation of the DOT. *Id.* As such, the Court concludes that the ALJ met his initial duty to ask whether the vocational expert testimony conflicts with the DOT. *Overman*, 546 F.3d at 463. Consequently, the success of Lane's argument in this regard depends on whether the discrepancies, not-so-clearly identified by Lane in her brief, were apparent at the time of the hearing, such that the ALJ should have sought additional clarification from the vocational expert. *See e.g. Overman*, 546 F.3d at 462-63.

At the hearing, Lane's attorney cross-examined the vocational expert immediately following the aforementioned testimony. *See* Tr. at 1381-83. During this cross-examination, Lane's attorney asked the vocational expert whether the identified jobs would require writing and typing and whether someone with carpal tunnel syndrome would be able to perform those functions of the jobs. *Id.* In response, the vocational expert acknowledged that the identified jobs would require the ability to write and potentially the ability to type but was unable to verify whether a splint would impede the ability to do those particular functions. *Id.* Lane's attorney did not ask any questions, however, with respect to the vocational expert's identified jobs and Lane's ability to lift only ten pounds. Following this brief period of cross-examination, the ALJ

did not ask any further questions of the vocational expert; and the hearing ended somewhat abruptly. *Id.*

Even though Lane's attorney did not specifically raise a discrepancy issue at the hearing, such inaction does not deem the argument waived on appeal before this Court. *See Overman*, 546 F.3d at 463. However, as a consequence, Lane must now show that the discrepancy issues, at the time of the hearing, were "obvious enough that the ALJ should have picked up on them without any assistance". *Id.* Other courts confronted with this precise issue have resolved the issue by determining whether the claimant's attorney elicited conflicting evidence from the vocational expert on cross-examination. If the claimant's attorney did elicit conflicting evidence and the ALJ failed to follow up with the vocational expert for clarification regarding the vocation expert's prior testimony, remand was considered warranted. *See e.g. Overman*, 546 F.3d at 464-65 ("The conflicts between the VE's supposed DOT-based testimony on direct and his statements on cross-examination, therefore, should have been apparent to the ALJ"). In contrast, however, where the claimant's attorney failed to elicit conflicting evidence or failed to cross-examine the vocational expert regarding his testimony, courts have considered the issue of apparent discrepancy to be waived on appeal. *See e.g. Barrett*, 355 F.3d at 1067 ("[B]ecause [the claimant's] lawyer did not question the basis for the vocational expert's testimony, purely conclusional though that testimony was, any objection to it is forfeited"); *Hofer*, 588 F.Supp.2d at 966-67. Stated differently, the applicable analysis is as explained by the Seventh Circuit as follows.

> What, then, happens when the discrepancy is unexplored? When no one questions the vocational expert's foundation or reasoning, an [ALJ] is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the Dictionary's-for the Dictionary, after all, just records other unexplained conclusions

and is not even subject to cross-examination. If the basis of the vocational expert's conclusions is questioned at the hearing, however, then the [ALJ] should make an inquiry (similar though not necessarily identical to that of Rule 702) to find out whether the purported expert's conclusions are reliable.

*Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002).

In the immediate case, Lane's attorney elicited seemingly conflicting testimony between the ALJ's hypothetical that Lane could not engage in work demanding constant manipulation of the hands and fingers and the vocational expert's testimony that the jobs identified would require the ability to write. *Contrast* Tr. at 1377 and Tr. at 1381-83. Despite this apparent discrepancy, the ALJ did not follow up with the vocational expert to resolve it. As such, remand is warranted in order for the ALJ to resolve the discrepancy between the jobs cited by the vocational expert and the limiting effects relating to Lane's carpal tunnel that were identified by the ALJ. *See e.g. Overman*, 546 F.3d at 464-65. However, Lane's attorney did not elicit conflicting testimony from the vocational expert with respect to the limitations relating to Lane's knee and ankle disorders. Indeed, Lane's attorney focused his cross-examination solely on the limitations related to Lane's carpal tunnel syndrome. As such, there were no apparent discrepancies between the ALJ's hypothetical and the jobs cited by the vocational expert in regards to Lane's knee and ankle disorders; and remand is not warranted in that regard.[13] *See e.g. Barrett*, 355 F.3d at 1067; *Hofer*, 588 F.Supp.2d at 966-67.

## V. Conclusion

For the aforementioned reasons, Lane's motion for remand of the ALJ's decision is

---

[13] However, the Court notes that, should the ALJ determine that a new hypothetical is necessary, following the ALJ's reassessed RFC determination, the Court's discussion regarding apparent discrepancies in the prior hearing will be rendered purely academic, as the ALJ, then, needs to obtain new testimony from the vocational expert.

**GRANTED.** [DE 1].  Accordingly, this case is **REMANDED** for further consideration by the

ALJ, consistent with the conclusions in this order.

      SO ORDERED.

      ENTERED:  August 3, 2011

                /s/ JON E. DEGUILIO
                Judge
                United States District Court